IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**

CUSHMAN V. CUSHMAN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

BRENT J. CUSHMAN, APPELLANT,
V.
RACHELLE L. CUSHMAN, APPELLEE.

Filed July 29, 2013.   No. A-12-1162.

Appeal from the District Court for Seward County: ALAN G. GLESS, Judge. Affirmed as modified.

Terrance A. Poppe and Benjamin D. Kramer, of Morrow, Poppe, Watermeier & Lonowski, P.C., L.L.O., for appellant.

Scott D. Grafton, of Svehla, Thomas, Rauert & Grafton, P.C., for appellee.

IRWIN, PIRTLE, and BISHOP, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Brent J. Cushman and Rachelle L. Cushman were married in 2002, and two children were born of the marriage, namely, a daughter born in 2003 and a son born in 2005. A decree dissolving the Cushmans' marriage was entered on November 30, 2012, by the district court for Seward County. Legal and physical custody of the children was awarded to Rachelle, and Brent was ordered to pay child support of $1,043 per month. The trial court also divided the marital estate. The court ordered Brent to pay Rachelle an equalization payment of $12,752, and $6,000 of Rachelle's attorney fees. Brent appeals the trial court's determinations with regard to custody, child support, division of the marital estate, and award of attorney fees. We affirm, as modified.

## II. BACKGROUND

This divorce and custody trial took place over 3 days: September 5, 12, and 13, 2012. At that time, Brent was 35 years old and Rachelle was 33. Their daughter was in fourth grade, and

their son was in second grade. Both children were attending school in Utica where both parties resided. Brent was in his ninth year of employment with a company in Lincoln as a "lead in the warehouse," earning $19.27 per hour (plus $1 per hour for "lead pay"), and working Monday through Friday, from 8:30 a.m. to 5 p.m. Rachelle had been employed as a cook in Waco since September 2011, earning $10 per hour, and working 1 to 7 p.m. on Mondays, Wednesdays, alternating Fridays, and then occasional 3-hour shifts on the weekends. Rachelle was also taking a 10-week class on Tuesday evenings at a community college in Lincoln, with plans to apply for jobs as a phlebotomist after completion of the class. A number of witnesses testified and numerous exhibits were received. We will address that evidence as necessary in our analysis section of each issue raised on appeal, namely: custody, child support, division of the marital estate, and attorney fees.

### III. ASSIGNMENTS OF ERROR

Brent assigns that the district court erred in (1) awarding Rachelle custody of the minor children, (2) calculating child support, (3) dividing the marital estate, and (4) ordering Brent to pay $6,000 of Rachelle's attorney fees.

### IV. STANDARD OF REVIEW

In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Mamot v. Mamot*, 283 Neb. 659, 813 N.W.2d 440 (2012).

In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Id.*

### V. ANALYSIS

#### 1. CHILD CUSTODY

The trial court awarded Rachelle legal and physical custody of the children. Brent argues that the trial court should have maintained the joint custody arrangement agreed upon by the parties during the pendency of the divorce or, alternatively, that the trial court should have awarded Brent primary physical custody.

Neb. Rev. Stat. §§ 42-364(3) and 43-2923 (Reissue 2008) require the district court to devise a parenting plan and to consider joint legal and physical custody. The statutes do not require the district court to grant equal parenting time to the parents if such is not in the child's best interests. *Kamal v. Imroz*, 277 Neb. 116, 759 N.W.2d 914 (2009).

In determining the best interests of the child in a custody determination, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing; (2) the desires and wishes of the minor child if of an age of comprehension regardless of chronological age, when such desires and wishes are based on sound reasoning; (3) the general health, welfare, and social behavior of the minor child; and (4) credible evidence of abuse inflicted on any family or household member.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004). See, also, §§ 42-364(2) and 43-2923.

Section 42-364 of the dissolution of marriage statutes requires that in dissolution cases, if the parties do not agree to joint custody in a parenting plan, the trial court can award joint custody if it specifically finds that it is in the best interests of the child or children. *State ex rel. Amanda M. v. Justin T.*, 279 Neb. 273, 777 N.W.2d 565 (2010). Joint physical custody must be reserved for those cases where, in the judgment of the trial court, the parents are of such maturity that the arrangement will not operate to allow the child to manipulate the parents or confuse the child's sense of direction, and will provide a stable atmosphere for the child to adjust, rather than perpetuating turmoil or custodial wars. *Zahl v. Zahl*, 273 Neb. 1043, 736 N.W.2d 365 (2007).

Keeping those legal propositions in mind, we now consider the evidence. In April 2011, Brent admitted to Rachelle that he had been unfaithful on multiple occasions and Rachelle admitted to Brent that she had been smoking marijuana for the past 4 years. After an argument in May, Rachelle moved from the family home in Utica (where they had lived since October 2006) and into a rental home in Utica. The children stayed with Brent in the family home. Brent filed a complaint to dissolve the marriage in June. From May to September, the children were primarily with Brent in the family home and Rachelle "would have them when she could," which on average was two to four times every 2 weeks, according to Brent. In August, Brent and Rachelle agreed to divide parenting time equally, with each parent having the children 7 days, with the exchange taking place on Tuesdays. Brent testified that the equal time did not actually commence until the end of September. We also note that a temporary order setting forth the joint custody stipulation and alternating week parenting schedule was not filed until January 12, 2012.

Beginning in the middle of May 2012 (about 1 year after moving from the family residence), Rachelle moved out of her rental home and started living with Kevin and Rose Garver and their two boys in a residence about six blocks from Brent's residence (family home). The Garver home had two bedrooms upstairs and two downstairs. Rachelle lived in the basement and paid no rent, but she contributed to utilities and chores, and helped with the Garver children. Rachelle had to leave her prior rental home because the landlord was redoing the basement and Rachelle was not able to pay rent. By May 2012, she was $2,100 behind on rent and $600 in utility bills (owed to the landlord). Rachelle was still living with the Garvers at the time of trial. Brent remained in the family home.

There was testimony by the parties and witnesses regarding the positive and negative aspects of each parent. Brent acknowledges that it was "clear from the testimony at trial that the children love both Brent and Rachelle and enjoy spending time with both of them." Brief for appellant at 24. Brent believes Rachelle "can be" a good mother, has told her she is "a great mother," and "absolutely" believes she loves the children. When asked what concerns he would have if custody was awarded to Rachelle, Brent responded, "I think the biggest thing is just attention - the attention they get," and Rachelle is not "dependable when it comes to the activities, their games, practices. A lot of times there is [sic] different things that come up, some

legit, some I don't think are legit, whatever the reasons where she has to change activities, change times with them."

Brent also "can't stand" Rachelle's use of marijuana, and he had asked her to not use it, not have it in the home, and not have drug paraphernalia in the home. Brent did not believe the children were aware of Rachelle's marijuana usage. Rachelle admitted to using marijuana, commencing in 2007 initially for headaches, but at the time of trial was also using it for anxiety and other pain in her body (she had a workers' compensation injury in 2005 that resulted in permanent disability to her left hand, right hand, and arms and that causes her hands to ache and affects her ability to work long hours). Rachelle stated, "When I was using marijuana, I would say it was twice a week for probably the four years that I was." She admitted that she knew Brent was opposed to her usage of marijuana.

Brent also had concerns about Rachelle's lack of steady employment and housing, as well as her involvement with a former boyfriend postseparation and his overnight stays when the children were present.

The primary concerns related to Brent were his temper, controlling behavior, infidelity, and viewing of Internet pornography. When Brent initiated counseling in 2010, he believed it was for anger issues, but he testified that a different counselor later suggested it was more a problem of being under a lot of stress and dealing with a lot of different things. Brent acknowledged that he sought counseling initially because he was being "real short" with Rachelle, the children, and people at work. For example, if someone at work said they could not do something, Brent would say, "'Well, that's 'cause you're just a lazy bum.' You know, stupid things like that, and I would just be very impatient, very inconsiderate." Brent acknowledged that the children had intervened during arguments he had with Rachelle, saying something about their yelling. Brent also acknowledged locking Rachelle out of the house and slamming the door in her face because he was mad at her, and he further acknowledged that he has bitterness related to the end of his relationship with Rachelle which was affecting his ability to communicate with her.

Brent agreed that he would follow Rachelle throughout the house when she was trying to get away from him, that he would try to make her talk against her will, and that he would stand in front of a door for a minute or two to prevent her from leaving. He acknowledged that was the wrong way to handle the situation, but stated, "I don't consider that controlling. I mean, I need to be able to stop. I need to be able to just let it be." Brent acknowledged having regrets about being too physical with the children. There were times "when I would get mad and they would walk away and I'd grab their arm," to say, "I've had enough of this." The children would tell him later, "Daddy, when you grabbed my arm you hurt my arm." Brent said he did not realize that, and this was something he brought up in counseling.

Rachelle also testified to the lack of respect she received from Brent, which was present during parenting time exchanges with the children present. When Rachelle would try to speak with Brent, he would not look at her and would just walk away. Brent also kept dropping off Rachelle's property without notifying her. Rachelle would find her "stuff from the house" sitting on her porch in the morning. After she moved in with the Garvers, Rachelle specifically asked Brent to quit dropping things off because there was no room. Nevertheless, on one occasion, without notifying Rachelle, Brent put some crystal in the back of Rachelle's pickup that was

already loaded with tree limbs, brush, and trash from a yard cleaning she had just finished. By the time Rachelle realized it was there, some of the crystal was broken.

Brent acknowledged having multiple affairs, including with a woman he had paid for a massage. He denied that he paid her for sex, saying, "I've gotten lots of massages that were not sexual. That one was." There was also evidence of Brent's viewing of pornography at home in different places in the home, including the dining room just down the hall from the children. Brent stated that he smashed the computer on the garage floor because "I was frustrated and angry with myself, but it was because I was upset about the access to pornography," and he wanted to deny himself access. Brent acknowledged having a problem with Internet pornography.

There were a number of other witnesses who testified about good and bad traits of each parent, all essentially corroborating, negating, or slightly varying from or adding to what Brent or Rachelle had testified to about themselves or about the other parent. We see no value to detailing every statement made for or against Rachelle and Brent, since it was largely cumulative of the evidence provided by the parties themselves, as summarized above.

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Watkins v. Watkins*, 285 Neb. 693, 829 N.W.2d 643 (2013).

The evidence reveals that the trial judge was faced with deciding a custody issue between parents who both had positive traits as well as deficiencies. Of particular concern, in our review, is Rachelle's admitted use of marijuana, Brent's temper, Brent's controlling behavior and lack of respect toward Rachelle, and the parties' inability to reasonably communicate. As to Brent's argument that joint custody should have been awarded, although Brent and Rachelle agreed to exercise relatively equal parenting time for the year preceding trial, that does not require the trial court to maintain that arrangement after hearing the evidence at trial. The evidence regarding the parties' inability to communicate, which was caused more by Brent than Rachelle, along with the lack of respect demonstrated by Brent toward Rachelle in the presence of the children, would weigh against a joint custody arrangement. We cannot say that the trial court abused its discretion by not awarding joint custody.

With regard to awarding legal and physical custody to Rachelle rather than awarding legal and/or physical custody to Brent, we can only conclude that the trial court determined that Rachelle's use of marijuana to allegedly control her residual pain from a prior work injury was less concerning than Brent's temper and anger issues. There was no evidence that Rachelle used marijuana around the children, that the children knew of her usage, or that her use of marijuana impacted her ability to properly parent the children. On the other hand, there was evidence that Brent's temper and anger were present around the children and did impact his parenting. We reiterate that there was also evidence of good parenting demonstrated by both parents. It is not this court's place to second guess a trial court's decision; rather, we are limited to look for any abuse of discretion.

Brent makes compelling arguments regarding how Rachelle's marijuana usage may impact the children in the future when they are older and "[t]he issue of drug use is bound to come up," and Rachelle's "complete disregard for the law" will make it "difficult to convince the

children that using drugs is dangerous and not in their best interest." Brief for appellant at 24. This may very well become a consideration in the future. However, on the record before us at this time, while we are concerned about aspects of both parents' behaviors, the evidence does not reflect that Rachelle's marijuana use is adversely impacting the children; whereas, Brent's anger and controlling behaviors have impacted the children, as well as his ability to reasonably communicate with Rachelle.

In considering the best interests of the children at this time and on this record, we cannot say that the trial court abused its discretion in awarding legal and physical custody of the children to Rachelle.

## 2. CHILD SUPPORT

The standard of review of an appellate court in child support cases is de novo on the record, and the decision of the trial court will be affirmed in the absence of an abuse of discretion. *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004).

The child support calculation incorporated into the decree shows a monthly income of $1,257 imputed to Rachelle and a monthly income of $4,703 imputed to Brent. Using those incomes and based on the resulting child support calculation, the trial court ordered Brent to pay $1,043 per month in child support for two children. In its decree, the trial court stated that the child support calculation was "based upon Brent's earning ability and Rachelle's actual earnings."

Brent argues that it was error for the trial court to impute an "earning ability" to him. Brent states that the trial court imputed an annual income of $56,436 to Brent, when Brent says he had earned $50,244.52 in 2011 and $45,345.16 in 2010. However, Brent's 2011 W-2 form provides an earnings summary which reflects that Brent's 2011 gross pay was $56,430.16. His taxable income (Box 1) reflects wages of $49,460.33. The earnings summary reflects that this taxable income is determined after deducting contributions paid into (a) Brent's 401K ($869.87), (b) a medical FSA account ($2,500), and (c) a 125 cafeteria plan ($3,599.96). Brent's wages for purposes of Social Security taxes was $50,244.52 (Box 3). The earnings summary shows that this amount was reached by allowing the same deductions described above, but not allowing a deduction for the 401K contribution. The child support calculation attached to and incorporated into the dissolution decree reflects that the trial court used a monthly income for Brent of $4,703. This equals an annual income of $56,436. As noted above, Brent's 2011 W-2 shows Brent earned $56,430.16, which divided by 12 equals $4,702.50. The trial court appears to have rounded that monthly figure up to $4,703. The district court did not abuse its discretion by relying on Brent's 2011 W-2 to determine Brent's monthly income for purposes of calculating child support.

We would note that Rachelle responds in her brief on this issue that the trial court "unintentionally transposed the names of the parties" in its order, because based on the evidence presented at trial, the incomes used by the trial court represented the earning capacity of Rachelle and the actual earnings of Brent. Brief for appellee at 22-23. This assertion is supported by the record, since Rachelle testified that her actual earnings were only $650 and that using $1,257 for her income reflects her working at minimum wage for 40 hours per week. The calculation used by the trial court imputed a monthly earning ability of $1,257 to Rachelle and used Brent's actual

income based on his 2011 W-2. The erroneous transposition of the names certainly makes sense based on the evidence, and as discussed above, we find that the trial court did not abuse its discretion in relying upon Brent's 2011 W-2 for purposes of calculating his child support obligation.

## 3. DIVISION OF MARITAL ESTATE

Brent first argues that the trial court erred in receiving exhibit 33, Rachelle's proposed division of assets and debts, after the proceedings had concluded. Brent then contends that the trial court erred in relying on Rachelle's list of assets and debts because (1) Rachelle's postseparation debts were included as part of the marital estate and should not have been, (2) the value of the family home was not indicative of market value, and (3) the value of Brent's 401K was wrong because of the valuation date used by the trial court.

The division of the marital estate in a dissolution case is initially left to the discretion of the trial court and will be reviewed by an appellate court de novo on the record and affirmed absent an abuse of discretion. *Tyler v. Tyler*, 253 Neb. 209, 570 N.W.2d 317 (1997).

The ultimate test for the appropriateness of a trial court's division of the marital estate is fairness and reasonableness as determined by the facts of each case. *Molczyk v. Molczyk*, 285 Neb. 96, 825 N.W.2d 435 (2013). Generally, the division of property in a dissolution case is based on equitable principles, and its purpose is to divide the marital assets equitably. *Medlock v. Medlock*, 263 Neb. 666, 642 N.W.2d 113 (2002).

### (a) Exhibit 33

We first address Brent's argument that the trial court should not have received exhibit 33 posttrial. The record reflects that after both parties rested, and after closing statements were made by the attorneys (not transcribed into the record), the following colloquy took place:

> [THE COURT:] [Counsel for Rachelle], you have seven days to submit a proposed parenting plan to me.
>
> [COUNSEL FOR RACHELLE:] All right, Judge.
>
> [THE COURT:] If you would like to submit more information to me in the nature of financial, you may.
>
> [COUNSEL FOR RACHELLE:] Judge, would you like to give me any guidance on the parenting plan and how that should be structured?
>
> [THE COURT:] I want to know what would be your client's suggested parenting plan.
>
> [COUNSEL FOR RACHELLE:] All right. We can do that.
>
> [THE COURT:] Anything else?
>
> [COUNSEL FOR BRENT:] Your Honor, if he's going to be arguing I guess division of assets and debts -
>
> [THE COURT:] You may as well.
>
> [COUNSEL FOR BRENT:] Well - but I mean, is that going to be evidence then, or is this just by way of argument?
>
> [THE COURT:] I think it's just by way of argument.

[COUNSEL FOR BRENT:] Okay - all right. I would just like seven days to respond to whatever he may give the Court in seven days.

[THE COURT:] You've got it.

In *State v. Ramirez*, 287 Neb. 356, 842 N.W.2d 694 (2014), an exhibit was not offered during the evidentiary portion of the trial and there was no motion to reopen the evidence, yet the trial court nevertheless received the exhibit to be included with the evidence transmitted to the jury for deliberation. The Nebraska Supreme Court held that the exhibit was a demonstrative exhibit, and "[a]s we have recently explained, demonstrative exhibits are exhibits offered at trial to aid or assist the jury in understanding the evidence or issues in a case." *Id.* at 376, 842 N.W.2d at 710. The *Ramirez* court further pointed out that the information contained in the later-received exhibit was a "synthesis of information taken from other lengthy exhibits that were properly received into evidence during trial without objection," and because the exhibit "contained facts already received in evidence, it was cumulative." 287 Neb. at 376-77, 842 N.W.2d at 710. "Cumulative evidence means evidence tending to prove the same point of which other evidence has been offered." *Id.* at 377, 842 N.W.2d at 710. Additionally, "the erroneous admission of evidence is not reversible error if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding of the trier of fact." *Id.* The *Ramirez* court determined that the exhibit at issue was a demonstrative exhibit and was cumulative of other properly admitted evidence, and therefore, the trial court did not abuse its discretion by admitting the exhibit after the close of evidence. The *Ramirez* court further stated, "We acknowledge that the formality of reopening the record was not observed," but that the exhibit was added to the evidence before the court reporter would later transmit the evidence to the jury, and therefore, "[w]e cannot find that the procedure employed was prejudicial." 287 Neb. at 377, 842 N.W.2d at 710-11.

Similarly, in this case, we conclude that exhibit 33 was merely a demonstrative exhibit, reflecting a summary of Rachelle's position with regard to her identification, valuation, and proposed division of the marital estate. All items identified on exhibit 33 were addressed during testimony at trial by either Rachelle or Brent. We also note that Brent was permitted to respond within 7 days to any such further "argument" on assets and debts. As in *Ramirez, supra*, we cannot find that the procedure employed here was prejudicial in light of the information being cumulative to the testimony at trial, and thereby serving as a demonstrative aid to the court rather than the receipt of substantive evidence. Finding no abuse of discretion by the trial court in admitting exhibit 33, we now review the trial court's reliance on the information contained in exhibit 33 to value and divide the marital estate as specifically challenged by Brent.

(b) Inclusion of Rachelle's Postmarital
Debt in Marital Estate

Brent argues that the trial court erred by including in the marital estate certain debts that Rachelle acquired after the parties had separated. These debts are itemized on Rachelle's exhibit 33 and total $11,500. Upon questioning by Brent's counsel, Rachelle testified that each of these debts were incurred after the parties separated. Rachelle stated that the loans from various individuals and credit charges were incurred to cover a retainer fee for her lawyer, gasoline, and "stuff like that . . . since the separation because of no child support from him for months." In

fact, on exhibit 33 in the box itemizing these debts, it specifically states, "Post-separation debt" and shows a total of $11,500, which also included her past-due rent obligations accrued after separation. Both parties agreed that a Discover credit card debt of $2,500 belonged in the marital estate and would be allocated to Rachelle. Both parties also agreed that a Wells Fargo debt of $815 was marital and would be allocated to Brent. This left only Rachelle's postseparation debt of $11,500 at issue. We agree with Brent that the trial court erred by including Rachelle's postseparation debt in the marital estate.

As stated in *Millatmal v. Millatmal*, 272 Neb. 452, 459, 723 N.W.2d 79, 87 (2006):

> Marital debt includes only those obligations incurred during the marriage for the joint benefit of the parties. *Mathews v. Mathews*, 267 Neb. 604, 676 N.W.2d 42 (2004). The burden to show that a debt is nonmarital is on the party making that assertion. Cf. *Parde v. Parde*, 258 Neb. 101, 602 N.W.2d 657 (1999) (burden of proof to show that *property* is nonmarital remains with person making that assertion). See, also, *McGuire v. McGuire*, 11 Neb. App. 433, 652 N.W.2d 293 (2002) (burden of proof to show that debt is nonmarital remains with person making that assertion).

This court has also stated that a marital debt is "a debt incurred during the marriage and before the date of separation, by either spouse or both spouses, for the joint benefit of the parties." *Finley-Swanson v. Swanson*, 20 Neb. App. 316, 325, 823 N.W.2d 697, 706 (2012) (citing to *McGuire v. McGuire*, 11 Neb. App. 433, 652 N.W.2d 293 (2002)). In *Finley-Swanson*, moneys used for attorney fees had been included in the marital estate. This court concluded that the debt was incurred after the parties were estranged and after the complaint for dissolution was filed, "were clearly not for the parties' joint benefit," and therefore did not constitute a marital debt. *Id.*

In *Mathews v. Mathews*, 267 Neb. 604, 676 N.W.2d 42 (2004), the Nebraska Supreme Court rejected the husband's argument that the $20,000 he had to borrow from his family should have been factored in the marital estate. The husband evidenced his financial devastation from the divorce by pointing out his average monthly expenses. The *Mathews* court stated that "[s]uch evidence, however, does not establish that the loan was marital debt," and the court further noted that "these proceedings have no doubt adversely affected Mark's financial circumstances," but the family loan was taken out after his separation and "is not properly recognized as marital debt." 267 Neb. at 621-22, 676 N.W.2d at 58.

Brent met his burden to establish that the $11,500 was postseparation debt through cross-examination of Rachelle, and additionally, Rachelle herself characterizes the debt as "post-separation" on exhibit 33. Accordingly, we modify that portion of the trial court's overall valuation of the marital estate by excluding $11,500 of Rachelle's postseparation debt.

### (c) Value of Family Home

Brent also argues that the trial court erred in using the assessor's value of the house, $83,032, rather than the October 2010 appraised value of $75,000 that Brent offered into evidence. At trial, Rachelle had disputed the 2010 appraisal because the parties had made improvements to the home since that time, including the addition of two bedrooms in the basement and egress windows. Rachelle testified that she believed the home was worth at least the assessed value, and she further testified that with some added drywall, paint, and carpet, the house could be worth $120,000.

Matthew J. Wilson, a self-employed, certified general real estate appraiser, who had been doing appraisals for 40 years, testified that he had appraised the family home in October 2010. The value determined at that time was $75,000. On cross-examination, he was asked whether he could say that $75,000 was the present value of the home. Wilson said he could not. At the time of appraisal, it was noted that the stoop and stairs were missing from the front of the house and that the owners were beginning to finish the basement and had recently improved drainage around the house. When asked if the basement actually being finished would increase the value of the home, Wilson responded, "Potentially, yes." But Wilson testified that the assessed value was "not indicative of market value." When asked whether an appraisal 2 or more years old would no longer be reliable, Wilson responded, "I would agree with that, yes." He further testified, "I have no idea what the present value of the home is."

Brent testified that the home was purchased in 2006 for $84,000 and that they still owed $76,800 on the loan. We note that on exhibit 9, Brent lists the loan balance at $77,100, which he testified was the balance owed at the time the parties separated. This latter figure was used by the trial court for the loan balance, and we find no error in its use of that amount. With regard to the value of the home, Brent testified that he had borrowed $8,050 against his 401K in 2010 and that at least $5,020 was used for the addition of egress windows. He acknowledged that since the 2010 appraisal, they had added two bedrooms in the basement for the children, along with the egress windows. The additional bedrooms required drywall installation and electrical work. Brent also testified that a $10,000 certificate of deposit initially acquired with part of the proceeds from Rachelle's workers' compensation settlement was cashed out and that a portion of those proceeds went into the house. He recalled that about $3,800 was used for I-beams in the basement, $365 for gutters, and $800 for concrete in the driveway. This totals $4,964, and Brent acknowledged that the I-beam work was done after the appraisal was done.

Based on Brent's own testimony, there appears to have been close to $10,000 in improvements made to the house since the 2010 appraised value of $75,000 was determined. Further, Wilson testified that he "had no idea" what the present value of the home was and that an appraisal 2 or more years old would not be reliable. Accordingly, we cannot say the trial court abused its discretion in using the assessed value of $83,032 for the home, and subtracting the loan balance of $77,100, to conclude the equity in the home was $5,932.

### (d) Value of Brent's 401K Account

Brent asserts that the trial court erred in relying on Rachelle's calculation of his 401K equity ($6,900) versus relying on Brent's calculation of equity ($2,144). Rachelle's calculation was based on Brent's testimony that if the court was to use present values, the present value of his 401K was $11,800 and the present balance of the loan against it was "forty nine something." Rachelle's exhibit 33 reflected a 401K value of $11,000 and a loan against it for $4,900, resulting in equity of $6,900. In a parenthetical below the amounts, it is noted that these values are "per Brent's testimony." Rachelle also offered exhibit 26, a document apparently reflecting the balance in Brent's account as of April 5, 2012. At that time, the account balance was $12,607, with a loan balance against it of $5,610.

Brent's exhibit 9 shows an account value of $9,191, with a loan balance of $6,332. Although the difference equals $2,859, Brent allowed for a 25-percent reduction, so his exhibit 9

shows equity of $2,144 in his 401K. The exhibit 9 values are supported by exhibit 13, a document reflecting the balance in Brent's account as of October 25, 2011. Brent argues that the increase in the overall value of his 401K was due to his repayments on the loan and that "[i]t would be inequitable to give Rachelle credit for Brent's actions during the separation and his repayment of the loan from his own funds." Brief for appellant at 35. Although we acknowledge that in dissolution actions, district courts have broad discretion in valuing pension rights and dividing such rights between parties, see *Harris v. Harris*, 261 Neb. 75, 621 N.W.2d 491 (2001), we agree with Brent that in this case, Rachelle should not benefit from debt payments Brent made after the parties separated. According to Brent's testimony, which is supported by his pay stub received as exhibit 3 and a loan summary received as exhibit 31, Brent was paying $35 per week toward his 401K loan. The annual equivalent would be $1,820, or $151.66 per month. The parties separated in May 2011; trial was held in September 2012. That equals about 16 months of payments, or $2,426.56 in loan payments from the time of separation to the time of trial. If we look at exhibit 13 (October 25, 2011, statement of Brent's account), it shows an account balance of $9,190 and a loan balance of $6,332. In the 11 months that followed leading up to trial, Brent would have paid $1,668.26 toward the loan. Not factoring in interest, those payments would have reduced the loan to $4,664 by the time of trial. Exhibit 31 shows us that the loan balance was $4,935 as of September 2012, when trial occurred. It is clear that Brent's payments on the loan after separation increased the overall equity in the account.

As noted by the Nebraska Supreme Court in *Tyma v. Tyma*, 263 Neb. 873, 877, 644 N.W.2d 139, 144 (2002):

> In a divorce action, "the purpose of a property division is to distribute the marital assets equitably between the parties." Neb. Rev. Stat. § 42-365 (Reissue 1998). Equitable property division under § 42-365 is a three-step process. The first step is to classify the parties' property as marital or nonmarital. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Gibilisco v. Gibilisco*, [263 Neb.] 27, 637 N.W.2d 898 (2002). The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Heald v. Heald*, 259 Neb. 604, 611 N.W.2d 598 (2000).
>
> The marital estate includes property accumulated and acquired during the marriage through the joint efforts of the parties. *Brunges v. Brunges*, 260 Neb. 660, 619 N.W.2d 456 (2000). The date upon which the marital estate is valued should be rationally related to the property composing the marital estate. *Id*.

In *Tyma, supra*, the trial court used the date of separation of the parties as the date upon which to identify the composition of the marital estate, as well as value it, because no property was accumulated and acquired through the joint efforts of the parties after they separated. The Nebraska Supreme Court concluded that the separation date was "rationally related to the property composing the marital estate." *Tyma*, 263 Neb. at 878, 644 N.W.2d at 144.

We conclude that the trial court abused its discretion by not taking into consideration the postseparation loan payments made by Brent on his 401K account, since the resulting restoration

of value in the 401K was not due to joint efforts of the parties, but by Brent's efforts alone. As set forth in *Tyma, supra*, the date upon which the marital estate is valued should be rationally related to the property composing the marital estate, and the marital estate includes property accumulated and acquired during the marriage through the joint efforts of the parties. Brent requested at trial, and on appeal, that the October 2011 account statement (exhibit 13) be used to establish the marital equity in his 401K, and we agree that the October 2011 date better reflects the marital equity in the account. It may still favor Rachelle slightly, since Brent had been paying on the loan since their separation in May 2011; however, Brent did not produce evidence of the account balance and loan balance as of May 2011. Therefore, we modify this portion of the trial court's determination of the marital estate by using the October 2011 account balances. Exhibit 13 shows an account value of $9,190.81, and a loan balance of $6,332.82. The marital equity in the 401K account is the difference of $2,857.99, and the marital estate calculations should be modified accordingly.

We note that although Brent reduced that amount by 25 percent (to $2,144) in his proposed division of assets and debts, presumably for potential future tax consequences, we can find no evidence in the record to support such a reduction. See *Jirkovsky v. Jirkovsky*, 247 Neb. 141, 525 N.W.2d 615 (1995) (25-percent reduction for taxes is not necessarily appropriate in every case; there must be credible evidence in record as to what tax ramifications associated with accounts will be in future).

(e) Summary of Revisions to Marital Estate

We conclude that it was not reversible error for the trial court to receive exhibit 33 posttrial, since it was a demonstrative exhibit and was cumulative to evidence presented during trial. We modify the trial court's determination of the assets and liabilities of the marital estate, which in turn affects the amount of marital equalization owed by Brent to Rachelle. Using the format of exhibit 33, our modifications are reflected below:

| **Brent** | | **Rachelle** | |
|---|---|---|---|
| Residence<br>$83,032 − $77,100 | $  5,932 | 1992 Silverado | $3,600 |
| Pontiac G6<br>$9,000 − $2,500 | 6,500 | 2002 Montana<br>$3,600 − $2,200 | 1,400 |
| 401K<br>$9,191.81 − $6,332.82 | 2,858 | 2007 Ford Focus | 0 |
|  |  | Insurance check | 2,013 |
| *Subtotal:* | *15,290* | *Subtotal:* | *7,013* |
| Less: |  | Less: |  |
| Wells Fargo | (815) | Discover Card | (2,500) |
| Total: | 14,475 | Total: | 4,513 |
| Difference<br>$9,962 ÷ 2 = $4,981 | (4,981) |  | 4,981 |
| Net Marital Estate: | $  9,494 | Net Marital Estate: | $9,494 |

Accordingly, as reflected in the table, Brent will have to pay Rachelle $4,981, rather than $12,752, to equalize the marital estate based on the allocation and valuation of assets and liabilities determined by the trial court and as modified herein.

### 4. ATTORNEY FEES

The award of attorney fees depends on multiple factors that include the nature of the case, the services performed and results obtained, the earning capacity of the parties, the length of time required for preparation and presentation of the case, customary charges of the bar, and the general equities of the case. *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006).

In an action for dissolution of marriage, the award of attorney fees is discretionary, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Mathews v. Mathews*, 267 Neb. 604, 676 N.W.2d 42 (2004).

Rachelle was awarded $6,000 for attorney fees, although her attorney fee affidavit sought slightly more than $10,000. Brent argues that Rachelle should be barred from recovering any attorney fees. Brent asserts again that the trial court erred by receiving an exhibit after the trial had concluded. This time, Brent argues that exhibit 34, Rachelle's attorney fee affidavit, was not marked, offered, or received during the proceedings and should therefore be excluded as evidence. We note for completeness that Brent does not argue that he was not given an opportunity to oppose the attorney fee requested, and we note that the record indicates that the court granted him permission to respond to "whatever" Rachel's counsel might give the court as set forth in the colloquy below:

> [COUNSEL FOR BRENT:] Okay - all right. I would just like seven days to respond to whatever he may give the Court in seven days.
> [THE COURT:] You've got it.

Had Brent not had an opportunity to challenge the attorney fees requested, then a remand may have been warranted on this issue. See *Winter v. Department of Motor Vehicles*, 257 Neb. 28, 594 N.W.2d 642 (1999) (trial court abused its discretion in granting attorney fees when opposing counsel was not given opportunity to oppose fee award; matter reversed and remanded for hearing on attorney fees). However, in this case, Brent argues only that the trial court erred in receiving exhibit 34, and without it, there "would be no evidence of the attorney fees Rachelle incurred and she should be barred from recovering the same." Brief for appellant at 36.

We earlier concluded that there was no prejudicial error in the trial court's receiving exhibit 33, a demonstrative exhibit, after the close of the evidence, since it was merely cumulative of evidence otherwise properly admitted at trial and it was being received only for "argument" purposes. In this instance, however, the exhibit at issue is not a demonstrative exhibit serving as an aid to the court to summarize evidence already properly admitted at trial. Rather, the exhibit is substantive in that it seeks to serve as evidence in support of an apparent request for attorney fees, which request we note was not specifically pled, but was made in the prayer of Rachelle's complaint for dissolution of marriage. We do not see in our record that any evidence was adduced during trial regarding Rachelle's request for attorney fees, nor any testimony about the amount of fees incurred. The only testimony touching on Rachelle's attorney fees was her statement that she borrowed $1,000 for her attorney's retainer and that Brent had been ordered to pay her a $1,000 temporary attorney fee, which he did pay. Nor do we see in the

record any evidence that any request was made to reopen the record to permit an offer of evidence in support of Rachelle's attorney fees. On this matter, the trial court's decree states: "[Brent's counsel's] attorney fees and costs were marked and received as Ex. 21. [Rachelle's counsel's] fees and costs are marked and received as Ex. 34." We see that exhibit 34 is attached to the decree rather than found in the bill of exceptions, similar to exhibit 33 discussed earlier.

"The erroneous admission of evidence is not reversible error if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding of the trier of fact." *State v. Ramirez*, 287 Neb. 356, 377, 842 N.W.2d 694, 710 (2014). The attorney fee affidavit in this case was not cumulative to other properly admitted evidence, since there was no evidence offered by Rachelle regarding attorney fees during trial other than her testimony that she borrowed $1,000 for her attorney's retainer and that Brent had paid her $1,000 for temporary attorney fees as ordered. We find that the trial court's posttrial receipt of substantive evidence without advanced discussion and agreement of the parties, or without formally reopening the evidence, constitutes error precluding consideration of exhibit 34. However, that does not end our inquiry on this issue because there is authority for consideration of attorney fees without the necessity of an attorney fee affidavit.

As stated in *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014), the filing of an affidavit is not absolutely necessary to support an award of attorney fees.

> The best practice will always be to provide an affidavit or other evidence such as testimony or exhibits as detailed above, and we certainly encourage doing so. With such evidence, a party is assured that both the trial court and the appellate court will not be required to scour a record in an effort to support attorney fees in any particular case.

*Id.* at 221, 846 N.W.2d at 633. The *Garza* court went on to state:

> We will not absolutely require the filing of an affidavit. As the Court of Appeals noted in *Boamah-Wiafe v. Rashleigh*, [9 Neb. App. 503, 519, 614 N.W.2d 778, 789 (2000),] "if the contents of the record . . . do show the allowed fee not to be unreasonable, then that fee would not be untenable or an abuse of discretion." But we emphasize that the filing of an affidavit or presentation of other evidence will always be the preferable way to support the award of attorney fees. Litigants who do not file an affidavit or present other evidence risk the loss of attorney fees, because of the difficulty of discerning such information from the record alone.

*Id.*

In *Boamah-Wiafe v. Rashleigh*, 9 Neb. App. 503, 614 N.W.2d 778 (2000), this court also provided a summary of cases where attorney fees were awarded without formal evidence introduced to support it. After discussing those cases, this court stated:

> From the above cases, we conclude that it is not strictly necessary for an applicant for attorney fees to introduce specific evidence to support an award of attorney fees, but before an award of attorney fees will be affirmed upon appeal, the record must contain the information that shows that the award is within the range of the trial court's discretion. "In this respect, a judicial abuse of discretion exists when the reasons or rulings of the trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition." *Schirber v.*

*State*, 254 Neb. 1002, 1005, 581 N.W.2d 873, 875 (1998). If the contents of the record, i.e., pleadings, introduced discovery documents, time spent in court as shown by the court record, and doubtless many other items which will support the award, do show the allowed fee not to be unreasonable, then that fee would not be untenable or an abuse of discretion.

Counsel is, however, well advised to introduce direct proof by way of an affidavit or otherwise.

*Boamah-Wiafe*, 9 Neb. App. at 519, 614 N.W.2d at 789.

Accordingly, it was not strictly necessary for Rachelle to have introduced specific evidence to support an award of attorney fees. However, before an award of attorney fees will be affirmed upon appeal, the record must show that the award is within the range of the trial court's discretion. We therefore review the record to see if it supports an attorney fee of $6,000. The record contains evidence of Brent's attorney fees in exhibit 21, which was properly admitted at trial and which would have been available for the trial court's consideration in determining an appropriate range of fees for this custody trial. We note that Brent's fees were just slightly higher than the $6,000 fee awarded to Rachelle, but we also observe that Brent brought in twice the witnesses and offered the larger portion of the exhibits. The attorneys had to appear over the course of 3 different days for the trial, and although there was nothing complex in the presentation of the marital estate, this was a custody trial that included considerable testimony from a number of witnesses. Based on the contents of the overall record before us, we cannot say that the fee was unreasonable, and therefore, we cannot say that the trial court's award was untenable or an abuse of discretion.

## VI. CONCLUSION

In summary, we affirm the district court's determination on custody, child support, and attorney fees, and affirm as modified its determination of the marital estate and the amount to be paid by Brent to Rachelle to equalize the marital estate.

AFFIRMED AS MODIFIED.